U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



Signed August 24, 2007

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES D. SCHMIDT, | § | Case No. 05-84993-SGJ-7 |
| | § | |
| DEBTOR. | § | |
| | § | |
| JAMES W. CUNNINGHAM, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 07-03068 |
| | § | |
| CAROLYN SCHMIDT and SILVER PARTNERS CORPORATION, jointly and severally, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT AVOIDING AND PERMITTING RECOVERY OF PREPETITION TRANSFERS OF PROPERTY BY DEBTOR

# FINDINGS OF FACT

1.      The Trustee's Complaint initiated an adversary proceeding pursuant to Rule 7001, Federal Rules of Bankruptcy Procedure; 11 U.S.C. §§544, 548 and 550; and Tex. Bus. & Com. Code §§24.005, 24.006 and 24.008.

2.      This Court has jurisdiction over the subject matter of the Complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3.      The matters raised in the Complaint constitute core proceedings within the meaning of 28 U.S.C. §157(b)(2)(A), (H) and (O).

4.      This Court has venue of these proceedings pursuant to 28 U.S.C. § 1409.

5.      Charles D. Schmidt (the "Debtor," and sometimes known as "Don" Schmidt) filed a voluntary Chapter 7 Bankruptcy proceeding on October 14, 2005 (the "Petition Date"). The Debtor's Schedules (Pl. Ex. 2) filed in his case show that the Debtor owned on the Petition Date $6,800 worth of personal property, consisting of two motorcycles worth $1,500; $300 in a bank account, and $5,000 worth of miscellaneous items and wearing apparel. The Debtor's Schedules also show the Debtor had $256,189.14 of unsecured indebtedness on the Petition Date, $72,861.51 of which was a "disputed" debt to an ex-wife Laurie, Schmidt. The Debtor's Schedules reflect he earns gross wages of $2,500 per month (net income of $1,838 per month) working as a "wholesaler" at HMS (which testimony indicated is a jewelry business that was founded by Debtor's grandfather and is or was owned by certain family members of the Debtor). The Debtor's Schedules list monthly expenses of $1,481 per month, including $500 for college education for a son.

6.      James W. Cunningham is the duly appointed and acting Chapter 7 Bankruptcy Trustee for the Debtor and the Plaintiff in this Adversary Proceeding.

7.      The Debtor and Defendant Carolyn Schmidt ("Carolyn")—who is Debtor's current spouse and is not a joint debtor-- married on October 12, 1989.

8.      Carolyn has been the Debtor's wife at all times relevant to this suit.

9.      The Debtor and Carolyn entered into a prenuptial agreement and purport to each have only separate property.  Among the separate property owned by Carolyn on the Petition Date were two houses in Dallas:  one on Chevy Chase and another on Bordeaux.  The house on Bordeaux was purchased just a few months before the Petition Date (in January or February 2005, according to Carolyn's testimony) with a $100,000 down payment provided to Carolyn by her mother.  Both houses were sold in late 2005.  Prior rulings from the bankruptcy judge earlier presiding over this bankruptcy case determined that these homes were Carolyn's separate property and not property of the bankruptcy estate.

10.     The Debtor owned interests in certain business entities, prior to his and Carolyn's 1989 marriage, including interests in GCS Holding Company; Startex; and Old South Realty, all of which interests remained separate property after their marriage (until ultimately sold).

11.     On April 23, 1990 the Debtor's ex-wife, Laurie Schmidt ("Laurie") obtained a default judgment against the Debtor in the amount of $37,350 plus attorneys fees of $3,325.00 plus interest to accrue against the Debtor (the "Judgment").

12.     Prior to the Judgment, the Debtor had refused to pay alimony to Laurie.

13.     The Debtor stopped paying alimony to Laurie two or three years before she commenced the lawsuit which resulted in the Judgment.

14.     The Judgment was for contractual alimony that the Debtor had not paid Laurie for months.

15.     The Defendants stipulated with Plaintiff that, as of the Petition Date, the Debtor had paid none of the Judgment.  However, Debtor testified at trial that he had an agreement with Laurie

that, if he shared 50-50 in their son Brandon's college education, that, upon Brandon's graduation from college, Laurie would release him from the Judgment. The Debtor and Carolyn further testified that he had paid Laurie several (approximately twenty-one) $500 payments during 2003-2005, totaling $10,500, which were transferred by the Debtor to Laurie by withdrawing cash from his bank account, and then obtaining cashier's checks (because he did not want Laurie to have his bank account information). There was no evidence of these twenty-one $500 payments, other than the Debtor's and Carolyn's testimony. Moreover, Question 3b (transfers to insider creditors within one year of bankruptcy), Question 7 ("Gifts"), and Question 10 ("Other transfers") of the Debtor's Statement of Financial Affairs (signed under penalty of perjury) do not disclose these payments to Laurie. The court finds that there is no credible evidence of how much money, if any, the Debtor has actually paid to Laurie in recent years, and the court finds (as stipulated) that the Debtor has paid none of the Judgment.

16.    As of the Petition Date, the Debtor still owed the full amount of the Judgment.

17.    As of the Petition date, the unpaid amount of the Judgment was $72,861.51.

18.    Even assuming the Debtor's and Carolyn's testimony about paying Laurie several $500 payments is true, Defendants have stipulated that, as of the Petition Date, the Debtor still owed Laurie money for the Debtor's son's college expenses.

19.    In summary, Laurie was a creditor of Debtor throughout the period of from January 1, 2003 to October 14, 2005 (the "Period Covered").

20.    Carolyn knew at least as early as January 2003 that the Debtor's ex-wife had the Judgment against him.

21.    The Debtor owed money to MBNA throughout the Period Covered.

22.    The Debtor owed money to Citi throughout the Period Covered.

23.    The Debtor owed money to Chase throughout the Period Covered.

24.     The Debtor owed money to Bank of America throughout the Period Covered.

25.     As of the Petition Date, the Debtor owed MBNA at least $56,000.00

26.     As of the Petition Date, the Debtor owed Citi at least $44,000.00

27.     As of the Petition Date, the Debtor owed Chase at least $11,000.00.

28.     As of the Petition Date, the Debtor owed Bank of America at least $10,000.00.

29.     In 1995, the Debtor sold his GCS Holding Company stock (his separate property) and received proceeds of a little over $100,000 (the "GCS Proceeds").  GCS Holding Company was an S corporation in the jewelry business.

30.     The Debtor did not pay any of the GCS Proceeds toward the Judgment, but used the GCS Proceeds to start Silver Partners, a Texas corporation, yet another jewelry business.

31.     Carolyn received the sole share in Silver Partners for consideration of one dollar.

32.     Carolyn has been the sole shareholder of Silver Partners at all times relevant.  The Debtor and Carolyn candidly admit that they set up Silver Partners in 1995 to be owned in Carolyn's name only to keep Laurie, Debtor's ex-wife, from being able to reach it to pay her Judgment. So, the Debtor transferred his separate property ($100,000 proceeds from sale of GCS) essentially to Carolyn to be her separate property (by investing the $100,000 into Silver Partners, and then structuring Silver Partners so that Carolyn would receive the sole interest in Silver Partners).

33.     Carolyn has been the Vice President and a director of Silver Partners at all times relevant.

34.     The Debtor never owned any shares in Silver Partners.

35.     The Debtor has been the President of Silver Partners at all times relevant.

36.     The Debtor did not own an interest in Silver Partners.  He did not list an interest in Silver Partners in the Schedules filed in his bankruptcy case.

37.    The Transfers of property of the Debtor forming the basis of Plaintiff's claims asserted in this adversary proceeding against the Defendants are evidenced by the checks summarized on Pl. Ex. 3.

38.    It was stipulated between the parties and the court so finds that Pl. Ex. 3 correctly summarizes the transfers that form the basis of the Plaintiff's Complaint.

39.    The payments of money by the Debtor that are evidenced by checks payable to Carolyn Schmidt in the aggregate amount of **$36,400.00**, as summarized on Pl. Ex. 3, are hereafter referred to as the "Carolyn Transfers.

40.    The payments of money by the Debtor that are evidenced by checks payable to Silver Partners in the aggregate amount of **$82,160.00**, as summarized on Pl. Ex. 3, are hereafter referred to as the "SP Transfers."

41.    The payments of money by the Debtor that are evidenced by checks payable to Cash in the aggregate amount of **$24,865.00**, as summarized on Pl. Ex. 3, are hereafter referred to as the "Cash Transfers".

42.    The foregoing Carolyn Transfers, SP Transfers, and Cash Transfers are collectively referred to as the Transfers.

43.    The Transfers were made during the Period Covered.

44.    With the exception of the checks from Silver Partners to Carolyn (the "SP Carolyn Transfers" summarized on Pl. Ex. 3), all of the checks on Pl. Ex. 3 were drawn on either (a) the Debtor's bank account, account No. 2082352, at Lone Star bank, or (b) the Debtor's bank account, account No. 0333130207 at First American Bank (collectively, the "Accounts").

45.    The Accounts were the bank accounts of the Debtor.

46.    The Accounts were in the Debtor's name only.

47.    The funds in the Accounts were separate property of the Debtor.

48.     The Debtor decided how, when and to whom to pay funds from the Accounts.

49.     Carolyn was not authorized to withdraw funds or draw checks on the Accounts.

50.     Carolyn kept a separate bank account from the Debtor.

51.     Each of the checks evidencing the Transfers was paid while the Debtor was insolvent within the four year period preceding the Petition Date.

52.     The money transferred by the payment of each of the Carolyn Transfers was a transfer of property of the Debtor to Carolyn.

53.     The money transferred by the payment of each of the SP Transfers was a transfer of property of the Debtor to Silver Partners.

54.     The Cash Transfers are evidenced by checks the Debtor wrote payable to "Cash" totaling $24,865.00.

55.     The Debtor received cash from his Accounts as a result of the Cash Transfers.

56.     The Debtor gave the cash he received as a result of the Cash Transfers to Carolyn.

57.     The Debtor transferred the funds he received from the Cash Transfers to Carolyn.

58.     Carolyn obtained cash from the Accounts as a result of the Cash Transfers.

59.     Carolyn received the cash from the Debtor as a result of the Cash Transfers.

60.     Carolyn and Debtor both testified at trial, contrary to sworn written discovery of Carolyn signed by her on June 8, 2007 (see Pl. Ex. 4, ##19, 34, & 35), that a significant amount of the $24,865 of Cash Transfers on Pl. Ex. 3 (twenty-one payments of $500 = $10,500) did not, in fact, go to Carolyn but instead went to Laurie, Debtor's ex-wife, for Debtor's son Brandon for college expenses, pursuant to an agreement with Debtor's ex-wife with regard to her unpaid Judgment (see paragraph 15 supra).   The court finds this trial testimony not reliable and disturbingly inconsistent with sworn admissions provided to the contrary approximately two months prior to trial.

61.     The money transferred by the payment of cash from the Cash Transfers was a transfer of property of the Debtor to Carolyn.  There is no credible evidence for what Carolyn did with the Cash Transfers.  Debtor and Carolyn testified that the money that Carolyn did receive (*i.e.,* cash that wasn't sent to ex-wife, Laurie, for son, Brandon's college) was used for a trip to Mexico ($1000) and for personal living expenses.  They did not provide any evidence other than:  (a) their general recollections of what the Cash Transfers were used for; and (b) some copies of checks from Carolyn's bank account during some of the Covered Period that show checks for seemingly normal life expenses (grocery store, credit card bills, occasional utilities).  These checks are largely meaningless since, in addition to the Carolyn Transfers, the Cash Transfers and the SP Carolyn Transfers, Carolyn received during the Covered Period at least the following additional source of funds:  $100,000 from her mother (for a down payment on a second house); $30,000 from her brother (six checks of $5,000) for support; payments of income to her from Silver Partners.  There is no record of what fungible money was used for what.

62.     Carolyn worked for Silver Partners from 1995 to at least 2003.  In a pretrial examination under oath, Carolyn testified that she left in 2003.  She testified that the company started doing poorly after September 11, 2001.  At trial, she said she actually worked at Silver Partners into 2004 and 2005 and that she had been "confused" when she gave her earlier inconsistent testimony about leaving the company in 2003.  This is but one example of several instances of inconsistent testimony from Carolyn.

63.     On March 24, 2003 Silver Partners sent a letter to its landlord, Halff Associates, stating as follows:

> "Dear Mr. Burns,
>         I certainly appreciate your courtesy and understanding during this difficult time. As discussed this date, we are closing our office due to continuing poor sales and losses. We deeply regret this, as we have enjoyed the location, even during the remolding [sic] of the second and third floors.  Our company is unable to support any office space based

on our current mounting financial losses, and place this letter as notice of our need to terminate our lease. As discussed, we should be able to vacate the premises within 30 days.
Should we need to discuss further, don't hesitate to contact.

Very truly,
Don Schmidt" (errors in original)

64. The Debtor and Carolyn testified that Silver Partners continued to operate out of Carolyn's Chevy Chase home after moving out of its leased space. Carolyn testified in a pretrial examination under oath that Silver Partners ceased to exist in July 2004. The Trustee testified he believes, based on his investigations, it ceased to exist a little earlier, in the March–June 2004 time frame. The court finds that Silver Partners ceased to exist some time in mid-2004 (the exact time being not relevant, for reasons later explained). The evidence shows that Silver Partners had no gross sales in 2005 (Pl. Ex. 10); Silver Partners had a mere $187,267 in gross sales in 2004, with $158,206 in cost of goods sold, for a mere $29,060 in gross profit (and negative operating profit) (Pl. Ex. 9); Silver Partners had $293,355 in gross sales in 2003, with $195,517 in cost of goods sold, for $97,838.40 in gross profit (and negative operating profit) (Pl. Ex. 8); and Silver Partners had $662,759 in gross profit in 2002, with $440,944 in cost of goods sold, for $221,815 in gross profit (and, once again, negative operating profit) (Pl. Ex. 8). Clearly, Silver Partners was in a downhill spiral from at least 2002 until it ceased to exist, with no profits at all during this time frame and sales dropping approximately 75% from 2002 to 2004.

65. The Defendants stipulated that Silver Partners lost money every year from 2000 through 2005.

66. Silver Partners lost $33,420 in 2000, $48,043 in 2001, $24,268 in 2002, $68,000 in 2003, and $81,677 in 2004.

67. After Carolyn left Silver Partners, she looked for a job, and went to work for another company, which did not work out.

68.     Starting in approximately October 2004, Carolyn worked at C&L Foods.

69.     Carolyn was an insider of the Debtor at all times relevant.

70.     Silver Partners was an insider of the Debtor at all times relevant.

71.     Silver Partners was an insider of Carolyn at all times relevant.

72.     Carolyn was an insider of Silver Partners at all times relevant.

73.     The Debtor was an insider of Silver Partners at all times relevant.

74.     On or about February 24, 2004 (roughly 20 months before the Petition Date), the Debtor sold the undivided interests he owned in companies called Startex and Old South Royalty (which companies were founded by his grandfather and were collectively owned by several members of Debtor's extended family) to his brother for $100,000.00 (the "Startex Sale"). These interests were Debtor's property owned prior to his and Carolyn's marriage. The Debtor's interest in Startex and Old South Royalty comprised substantially all of the Debtor's assets (and, again, were his separate property).

75.     The Debtor asserts that he then loaned at least $73,500.00 of the Startex Sale proceeds to Silver Partners (the "Loan"). There is no documentation for this Loan (*e.g.,* no promissory note; no payments terms associated with the Loan). Silver Partners was insolvent at the time of this so-called Loan, had abandoned its office premises, and, as shown above, had experienced a dramatic drop in business. Pl. Exs. 8-9.

76.     In any event, Silver Partners received at least $73,500.00 of the Startex Sale proceeds from the Debtor during the March – June 2004 time frame and a total of $82,160 from the Debtor during January-June 2004. Pl. Ex. 3.

77.     Check No. 1458 on Pl. Ex. 3 in the amount of $21,000.00 comprised part of the Loan.

78.     Check No. 1463 on Pl. Ex. 3 in the amount of $3,000.00 comprised part of the Loan.

79.     Check No. 1497 referenced on Pl. Ex. 3 in the amount of $40,000.00 comprised part of the Loan.

80.     Silver Partners never repaid any of the Loan to the Debtor. The so-called Loan was not scheduled by the Debtor in his Schedule B filed in the bankruptcy case, although it technically would have been a receivable of the estate.

81.     The Loan had no value to the Debtor. The Debtor's Statement of Financial Affairs do state that the Debtor received $12,607.50 in compensation from Silver Partners in 2004 (down from $25,537.50 in 2003). Pl. Ex. 2. However, the Debtor was not an equity owner of Silver Partners and had every reason to know, as an insider, that Silver Partners was in a down hill spiral.

82.     Silver Partners did not prepare any cash flow projections during the Period Covered.

83.     The Debtor testified that Silver Partners used part of the Loan proceeds to prepare and mail out a catalog in June 2004. There is no proof to potentially corroborate this testimony, other than (a) an undated catalog offered into evidence (Def. Ex. 5), which was allegedly the 2004 catalog, and which catalog shows the pre-March 2003 address for Silver Partners on the back, and (b) a $26,554 line item for "catalog expenses" on the unaudited December 31, 2004 income statement for Silver Partners. Pl. Ex. 9. The Debtor testified the 2004 catalog went to 20,000-25,000 customers around the country, with such customers being mom-and-pop type retail jewelry stores that also do business with the other family-owned jewelry business, HMS. The court finds this evidence to not be 100% credible. Among other things, the court is skeptical how a 48-page glossy, color catalog (involving multiple vendors—a photographer and a printer at least, according to Carolyn) could be mass produced and mailed to 20,000-25,000 customers at a cost of $26,554, according to the Debtor's income statement (the same income statement

shows $867.69 postage expense in 2004). This is but one example of testimony from Carolyn and the Debtor that does not quite "compute."

84.     In any event, the Debtor made the so-called Loan to Silver Partners while not paying his debts.

85.     Silver Partners wrote the SP Carolyn Transfers checks to Carolyn out of the funds "loaned."

86.     As of the Petition Date, the value of the Debtor's assets was $6,800.00.

87.     As of the Petition Date, the Debtor's debts totaled $256,189.14.

88.     The Debtor paid for very little if anything, for the house in which he and Carolyn lived except for half a fence about 5 – 7 years before the Petition Date.

89.     Carolyn paid for all household expenses, including utilities.

90.     Except for paying for a fence in the amount of $1,700.00, the Debtor did not help with household expenses.

91.     The Debtor did not pay utilities and other kinds of expenses at the Chevy Chase house.

92.     The Debtor also paid for yard work but not as much as $1,000.00.

93.     The only major expense that the Debtor paid for at the property where he and Carolyn lived was $1,200.00 for the fence repair.

94.     The Carolyn Transfers were deposited into Carolyn's account and were, according to Carolyn and Debtor testimony, a combination of gifts from Debtor to Carolyn for thanks for Carolyn working for Silver Partners (her own wholly owned separate-property company) and/or actually payment to her for services for Silver Partners.

95.     The only consideration Carolyn provided to the Debtor during the Period Covered was love and companionship as the Debtor's wife.

96.     Silver Partners did not provide any consideration to the Debtor during the Period Covered, other than $12,607.50 of income or compensation, according to the Debtor's Statement of Financial Affairs.

97.     Silver Partner's Financial Statements as of December 31, 2003 reflect that Silver Partners paid Carolyn regular pay in the amount of $46,935.00 in 2003.

98.     Silver Partner's Financial Statements as of December 31, 2004 reflect that Silver Partners paid Carolyn regular pay in the amount of $9,590.00 in 2004.

99.     Silver Partner's Financial Statements as of December 31, 2005 reflect that Silver Partners paid Carolyn regular pay in the amount of $6,440.00 in 2005.

100.    The Carolyn Transfers were made with the intent to hinder, delay, or defraud the Debtor's Creditors.

101.    The SP Transfers were made with the intent to hinder, delay, or defraud the Debtor's Creditors.

102.    The Cash Transfers were made with the intent to hinder, delay, or defraud the Debtor's Creditors.

103.    The Debtor did not receive reasonably equivalent value for the Carolyn Transfers.

104.    The Debtor did not receive reasonably equivalent value for the SP Transfers.

105.    The Debtor did not receive reasonably equivalent value for the Cash Transfers.

106.    The Debtor reasonably should have believed that the Debtor would incur debts beyond the Debtor's ability to pay as they became due.

107.    The Debtor was engaged, or was about to engage, in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

108.    There is no reliable evidence that Carolyn used the money constituting the Carolyn Transfers to pay for living expenses incurred by her and the Debtor.

109.    The SP Transfers were made, in part, as a subterfuge for funneling the SP Carolyn Transfers money to Carolyn.

110.    The Debtor's creditors were not all also creditors of Silver Partners.

111.    The Debtor had creditors that were not creditors of Silver Partners.

112.    The SP Transfers were not made in exchange for reasonably equivalent value to the Debtor.

113.    The SP Transfers were not used for purposes that gave reasonably equivalent value to the Debtor.

114.    Most of the SP Transfers, if not all, were not used to pay Silver Partners' Creditors and Carolyn.

115.    D. Ex. 1 is not a reliable or trustworthy summary of Defendants' and Debtor's source of funds and application of the funds.

116.    D. Ex. 1 is a self serving, unreliable contention regarding Defendants' and Debtor's source of funds and application of the funds with no corroboration from any more reliable source.

## CONCLUSIONS OF LAW

117.    For the purposes of the above captioned adversary proceeding, as of the Petition Date, the Plaintiff stands in the shoes of MBNA, Citi, Chase, Bank of America, Laurie and any other creditors of the Debtor.

118.    The burden of proof to establish all requisite elements to set aside transfers either made with intent to hinder, delay, or defraud creditors (actual fraud), or transfers for which less than reasonably equivalent value was received in exchange and debtor was or became insolvent

(constructive fraud), either under 11 U.S.C. § 548 or Tex. Bus & Com. Code § 24.005 and § 24.006, is initially on the Plaintiff. Once a prima facie case is made, the burden shifts to the Defendants to refute the evidence. Actual intent to defraud creditors must be proven by clear and convincing evidence. However, intent to defraud may be implied from circumstances surrounding transactions and the presence of some of the so-called badges of fraud. *See, e.g., United States v. Kaplan*, 277 F.2d 405, 408-09 (5th Cir. 1960); *United States v. Klutts*, 216 B.R. 558, 562 (Bankr. W.D. Tex. 1997); *Sommers v. Sorce (In re Major Funding Corp.)*, 126 B.R. 504, 508 (Bankr. S. D. Tex. 1990). The badges of fraud, from which a court might infer actual fraud, include: the transfer was to an insider; the debtor retained possession or control of the property transferred after the transfer; the transfer was concealed; before the transfer was made, the debtor had been sued or threatened with suit; the transfer was of substantially all of the debtor's assets; the debtor absconded; the debtor removed or concealed assets; the debtor was insolvent or became insolvent shortly after the transfer. Tex. Bus. & Com. Code § 24.005(b). "[D]ebtor's intent at the time of conveyance [under the Texas Fraudulent Transfer Act] [is] the crucial element." *Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir. 1988). "Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent." *Id.* at 1402-03. "[F]or the court to infer a fraudulent intent, it is not necessary that all of the 'badges of fraud' listed in Tex. Bus & Com. Code § 24.005(b) and discussed in the case law on fraudulent transfers be present." *In re Porras*, 312, B.R. 81, 105 (Bankr. W.D. Tex. 2004) (declining to grant summary judgment in that particular instance, since the question of fraud is such a fact intensive inquiry). "When several of these indicia of fraud are found, they can be a proper basis for an inference of fraud." *Roland v. United States*, 838 F.2d at 1403.

119.    Many of the badges of fraud have been proven by Plaintiffs from which this court has inferred intent to defraud, hinder and delay creditors, particularly the Debtor's ex-wife Laurie. All of the Transfers in question were to insiders (*i.e.,* to Carolyn and Silver Partners).   The Debtor retained control over the SP Transfers, since he was president of Silver Partners.   Before the transfers, the Debtor had been sued—in fact, years ago, by Laurie.   In fact, the Debtor and Carolyn unabashedly admit that Silver Partners was structured the way it was (with Carolyn as the sole shareholder--despite the fact that Debtor had contributed its sole capital in 1995---$100,000 of his own separate property) to prevent Laurie from getting at Silver Partners' assets. There was also testimony from the Debtor and Carolyn about the Debtor not wanting Laurie to know what bank accounts the Debtor had.   It is stipulated that Debtor was insolvent at the time of all the Transfers.   It is also clear that the Transfers were of substantially all of the Debtor's assets (the Debtor claimed a mere $6,800 of his personal property at the Petition Date).   With regard to the $73,500 "Loan" to Silver Partners, there was certainly concealment, since there is no documentation for the "Loan" whatsoever and it was not listed in the Debtor's Schedules in his case.   Plaintiff, with proof of many of these various badges of fraud, has made a prima facie showing of actual fraud.   But further proof of actual fraud was the frequent inconsistent testimony of Carolyn, in pretrial discovery versus trial testimony.   Where there is a lack of candor or consistency, the court may infer there is an intent to deceive.

120.    The Plaintiff demonstrated for this court that the Debtor did not receive reasonably equivalent value in exchange for the SP Transfers of $82,160 ($73,500 of which was supposedly a "Loan").   The Defendants have suggested that there was, in fact, reasonably equivalent value in exchange for the SP Transfers, because there was still some reasonable expectation that Silver Partners would be viable and be able to yield for the Debtor and Carolyn a livelihood, during the time frame in 2004 when the Debtor made the SP Transfers.   However, not only does this miss

the point—the point being that the Debtor was *not a shareholder investing in his own company*, at the time of the SP Transfers (but instead was investing his separate property money into his wife's separate property company)--but this court does not believe that some unquantified benefit of the Debtor having a future livelihood from Silver Partners (when it had never been profitable and never paid Debtor very much income) constitutes "reasonably equivalent value." *Smith v. American Founders Financial, Corp.*, 365 B.R. 647, 669 (S.D. Tex. 2007) ("[T]he unquantified benefit of continued business was not reasonably equivalent value for assets [the debtor] pledged to secure the $250,000 loan to [an] affiliated entity," *citing In re Minnesota Utility Contracting, Inc., 110 B.R. 414 (D. Minn. 1990)*). The evidence of (a) when precisely Silver Partners ceased to exist (early or late 2004); (b) whether Silver Partners spent part of the SP Transfers on a 2004 catalog that may have reasonably been expected to bring in sales; or (c) whether Silver Partners was justified in paying Carolyn $17,461.14 of the SP Transfers (for $1,200 per month for "rent" for Silver Partners using her house, and for her additional wind-down services or whatever) is largely irrelevant. The court suspects that Defendants are attempting to establish a good faith affirmative defense here (by testifying about their pie-in-the-sky dreams for Silver Partners). However, "[w]here a transferee is an insider and knows the transferor is insolvent at the time of the transfer, it cannot be a good faith transferee." *Flores v. Robinson Roofing & Const. Co, Inc.,* 161 S.W.3d 750, 756 (Tex. App. -- Fort Worth, 2005). Moreover, there is just no rational basis for finding there was reasonably equivalent value back to the Debtor in a situation in which he put almost all of his separate property into his wife's separate-property company, at a time when he was insolvent and the company was insolvent. The Defendants have also asserted that the Debtor's creditors were also Silver Partner's creditors and that the SP Transfers went to pay Silver Partner's creditors. Not only was there no evidence of that, but one major creditor of Debtor (Laurie) was absolutely not a Silver Partners creditor.

121.    The Plaintiff also met his burden of proof that the Debtor did not receive reasonably equivalent value in exchange for the Carolyn Transfers and Cash Transfers.  The Debtor and Carolyn both assert that transfers made to Carolyn were gifts from the Debtor to Carolyn and were used to support the family per Carolyn's obligation as the Debtor's spouse.  Specifically, the money paid to her was used to pay (a) day to day living expenses for which she and the Debtor were both liable and (b) to pay the debts of Silver Partners for which she and the Debtor were both liable.  They cite to two provisions of the Texas Family Code, section 2.501 and section 3.201.

122.    The court acknowledges that there is some support for this notion.  *United States v. Goforth,* 465 F.3d 730, 736 (6th Cir. 2006) ("a debtor [receives] 'reasonably equivalent value' when he/she makes payments to his/her spouse (or co-habitant) that are used for household expenses"); *In re Montalvo*, 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005) (court found that transfers to wife/fiancee, where the debtor had a legal obligation to support his wife and children under Kentucky law, were not fraudulent transfers; "The debtor met [his familial obligations] by transferring funds to the Defendant for the purchase of these items"); *In re Meinen*, 232 B.R. 827, 842 (Bankr. W.D. Pa. 1999) (debtor-husband deposited his separate property earnings into a bank account he and his wife held as tenants by the entireties; "The subsequent satisfaction of an insolvent debtor's reasonable and necessary household expenses can be viewed as a reasonably equivalent value that is received by said debtor in return for a deposit of his or her funds into an entireties account.").  *But see Carneal v. Leighton*, 237 F. Supp.2d 104, 109-110 (D. Me. 2002) (where husband transferred a mutual fund to his wife and asserted that he received reasonably equivalent value, in that the funds provided for household expenses and the support of children, court concluded that under Maine's version of the UFTA, transfers motivated by a desire to support family members have often been found to be fraudulent in that they have "the underlying

purpose of retaining resources to provide for oneself or one's family rather than have those resources available to creditors. . . . [b]ecause Mr. And Mrs. Leighton are married, the payments of the household expenses and support of the children are as much Ann Leighton's responsibility as Frederick Leighton's").

123.    However, there are at least three reasons why this defense does not work with the facts in this case. One, there is no evidence that the money from the Carolyn Transfers or the Cash Transfers (as opposed to the other fungible money in Carolyn's bank account from her own earnings, or from the $130,000 of support she received from mother and brother) were used for necessary living expenses. Second, the documentary evidence allegedly showing use of funds to pay living expenses (or "necessaries" as contemplated by the Texas Family Code) was not complete or reliable. See Pl. Exs. 6 & 7 (showing random checks to payees such as a grocery store, pharmacy and utility company, but still other checks to such payees as "Merrill Lynch" ($3,000 on August 24, 2004, Pl. Ex. 7); someone named "Stephanie May" (eight checks totaling approximately $1000); checks to certain individuals with "Happy Easter" in the memo line; and checks to high end vendors such as Neiman Marcus and a popular lingerie store). The court notes that there was no evidence that Debtor or Carolyn have any minor children that they are supporting. Third, the testimony of Carolyn and the Debtor is just too inconsistent to be reliable with respect to the "living expenses/necessaries" defense. In pretrial discovery, Carolyn simply stated that the Cash Transfers and Carolyn Transfers were gifts. At trial, there was suddenly testimony that the Transfers were for support, conspicuously around the same time that Carolyn was buying a second home.

124.    The Transfers are avoidable pursuant to §544(b)(1) of the Bankruptcy Code and §§ 24.005 and 24.008 of the Texas Business and Commerce Code.

125.    The Transfers are avoidable pursuant to Section 544(b)(1) of the Bankruptcy Code and Sections 24.006 and 24.008 of the Texas Business and Commerce Code.

126.    The Transfers, to the extent they occurred within the year prior to the Petition Date, are also avoidable pursuant to Section 548(a) of the Bankruptcy Code.

127.    Pursuant to Section 550 of the Bankruptcy Code, Carolyn is the immediate or mediate transferee of $17,461.14 of the SP Transfers.  She is also a person for whose benefit the SP Transfers were made, since she was the sole shareholder of Silver Partners, was taking money out of Silver Partners for "wind down services" shortly after the SP Transfers, and was taking $1,200 per month out of Silver Partners for rent for Silver Partners doing business out of her home.

128.    The Plaintiff may recover from Defendant Carolyn the total amount of the Carolyn Transfers, the SP Carolyn Transfers, and the Cash Transfers pursuant to §550(a), United States Bankruptcy Code.

129.    The Plaintiff may recover from Defendant Silver Partners the total amount of the SP Transfers by the Debtor to the Defendant pursuant to §550 (a), United States Bankruptcy Code.

130.    The amount of $78,726.14 is recoverable by the Plaintiff from Defendant Carolyn.

131.    The amount of $82,160.00 is recoverable by the Plaintiff from Defendant Silver Partners.

***END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW***